[No. B233318. Second Dist., Div. Six. Jan. 10, 2013.]

SAVE CUYAMA VALLEY, Plaintiff and Appellant, v.
COUNTY OF SANTA BARBARA et al., Defendants and Respondents;
TROESH MATERIALS, INC., Real Party in Interest and Respondent.

## COUNSEL

Law Offices of Babak Naficy and Babak Naficy for Plaintiff and Appellant.

Dennis A. Marshall, County Counsel, Michael C. Ghizzoni, Chief Assistant County Counsel, and Rachel Van Mullem, Deputy County Counsel, for Defendants and Respondents.

Jeffer Mangels Butler & Mitchell, Kerry Shapiro and Scott N. Castro for Real Party in Interest and Respondent.

## OPINION

**HOFFSTADT, J.**\*—Plaintiff Save Cuyama Valley (Save Cuyama) appeals from the judgment denying its petition for a writ of mandate. The County of Santa Barbara and its board of supervisors (collectively, the County) granted real party in interest Troesh Materials, Inc. (Troesh), permission to begin sand and gravel mining in the bed of the Cuyama River. Save Cuyama asks us to overturn that decision. Save Cuyama contends that the final revised environmental impact report (Report) that formed the basis for the County's approval violates the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) in a variety of ways. We reject Save Cuyama's arguments and affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

A. *The Diamond Rock Mine Project*

Nearly 10 years ago, Troesh applied to the County's planning and development department for a conditional use permit to begin excavating and

---

\*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

processing sand and gravel in a project called the "Diamond Rock mine." The mine would be located within the often dry bed of the Cuyama River at a stretch where it is 2,500 feet wide. The mine would excavate approximately 900 feet away from the river's usual flow, and would process materials at a nearby facility above the riverbed. The mine would be located 5.9 miles southeast of the intersection of State Highways 33 and 166, approximately 1,500 feet upstream from another sand-and-gravel mine. This other mine is the 15-acre GPS mine. The GPS mine has operated in the river's path since 1969 and has excavated an average of 160,000 tons of material each year. The Diamond Rock mine would be excavated over time in a series of trenches, with a new trench being started once the prior trench reached the maximum depth of 90 feet. The mine would excavate an average of 500,000 tons each year, and by the end of the 30-year permit Troesh sought, would cover 84 acres.

### B. *The Final Revised Environmental Impact Report*

The County commissioned the preparation of an environmental impact report. Over the next several years, the County received comments and made several revisions. The Report was released in May 2007, and the board of supervisors adopted and certified it on September 23, 2008. Among other things,[1] the Report and administrative record upon which it is based address the following topics:

#### 1. *Hydrological impacts on the Cuyama River*

The Cuyama River carries both water and sediment as it flows. Using a methodology developed by the Army Corps of Engineers called the "Hydraulic Engineering Center's River Analysis System," the Report's consultants calculated that the Cuyama River deposits a net surplus of 229,000 tons of sediment each year in the area of the riverbed where the Diamond Rock and GPS mines would operate.[2] If both mines were to excavate sand and gravel *solely* from the river's flows, their combined annual extraction of one million tons per year (500,000 for the Diamond Rock mine and a new higher limit of 500,000 for the GPS mine) would result in an annual sediment deficit of 771,000 tons in that area. The Diamond Rock mine, however, would not be in the river's path and would be surrounded by "low flood control berm[s]" (four feet high and 10 feet wide at the base) to direct flows around the mine's

---

[1] We only discuss those portions of the Report challenged on appeal.

[2] The study calculated that, on its own, the river deposits 314,000 tons per year and carries away 85,000 tons per year, amounting to an annual net surplus of 229,000 tons.

excavations. The berms would not be impenetrable, however. During seasonal "substantial rain events," it is expected that the river would overrun the berms and flow into the mine's excavation pits.

The Report accordingly acknowledges that the Diamond Rock mine "could affect river hydraulics." The Report identifies three possible hydraulic impacts. First, the mine could cause "downstream channel degradation": If the river flows into an excavated pit, it would deposit its sediment in the pit and any water leaving the pit (once the pit is full) would carry less sediment and flow more quickly, which could scour the riverbed immediately downstream of the pit. Second, the mine could cause "headcutting": If the river flows over the upstream lip of the pit, the water and sediment in that flow could erode the lip and effectively cause the mine's upstream edge to migrate upriver. Third, the mine could cause "bank erosion": If the river's flow is diverted by the mine's berms, the new flow pattern could erode the banks of the river.

Notwithstanding the *possibility* of these impacts, the Report opines that they are not likely to occur. No channel degradation had occurred downstream of the GPS mine during the decades of its operation. The Report further reasons that the sediment-laden flood waters, once they fill the Diamond Rock mine's pits, would flow over those pits and fill in any downstream scouring damage, effectively "resetting" (or filling in) any damage to the channel. Nor is headcutting likely, because the riverbed has a "very low" slope and the bed is composed of "enough large material . . . to armor the upstream lip of the pit"—observations confirmed by the absence of any headcutting during the 30-year life of the GPS mine. Bank erosion is also unlikely because the riverbed is over 2,000 feet wide at the mining sites and the river's flows are typically shallow, a prediction also confirmed by the absence of any bank erosion over the last few decades of mining.

To assess whether any of these possible but unlikely impacts are significant and in need of further analysis under CEQA, the Report defines a "threshold of significance." The Reports cites the "Environmental Checklist from CEQA Guidelines Appendix G" (Appendix G) and notes that any of Appendix G's 10 factors "could trigger a finding of potentially significant impact related to hydrology/flooding." The Report nonetheless adopts a more tailored threshold of significance for the particular hydrological effects outlined above: "Under CEQA, hydraulic impacts are considered adverse if they cause channel bed degradation and/or bank erosion that: 1) damage public infrastructure such as bridges or pipeline crossings; 2) damage or destroy adjacent developed land uses or structures due to bank erosion or flooding; 3) disturb, convert, or destroy valuable in-channel riparian habitat; or 4) expose people to a new flooding hazard."

The Report concludes that the "magnitude" of the three possible impacts previously identified are "expected to be minor" and would likely have no secondary impacts (to infrastructure, adjacent development or habitats). Thus, the Report concludes, the Diamond Rock mine's hydrological impacts "appear to be less than significant." Rather than stop there, however, the Report acknowledges "the inherent uncertainty of simulation models and the potential to underestimate [hydrological] effects." The Report accordingly deems these impacts to be "potentially significant but mitigable." (Boldface omitted.)

The Report then proposes mitigation measure W-2 (MM W-2), which Troesh must implement as a condition of the County's granting Troesh a conditional use permit to operate the mine. MM W-2 requires Troesh to (1) conduct a semiannual survey of river bottom elevations in three locations (in the middle of the Diamond Rock mine pit, at 1,000 feet upstream and at 1,000 feet downstream of the mine); (2) submit this data for review by the state's Office of Mine Reclamation (OMR), the County's planning and development department, and the County's flood control district as part of the OMR's annual Surface Mining and Reclamation Act of 1975 (SMARA; Pub. Resources Code, § 2710 et seq.) compliance review; and (3) should "adverse hydraulic conditions [be] evident, or appear to be developing, which could result in off-site impacts," to confer with the County agencies to modify the mining pit layout, width and/or depth to avoid these impacts.

### 2. *Impacts on water resources*

The Report analyzes two aspects of the Diamond Rock mine's effect on the local water supply pertinent to this appeal: usage and quality.

The Diamond Rock mine operation, along with its adjacent processing plant, would draw water locally for dust control and for processing, although Troesh anticipates a 74 percent recycling rate. To evaluate whether the mine's water consumption is significant within the meaning of CEQA, the Report uses the threshold of significance formally adopted by the County in its Environmental Thresholds and Guidelines Manual (Manual). Although the most recent update to the groundwater thresholds was in August 1992, the County confirmed the continued validity of those thresholds with agency staff and by evaluating more recent studies. The Manual defines significance by referring to how a project's water usage would affect the water supply of the alluvial aquifer underlying the entire 1,140-square-mile Cuyama River watershed. Because that watershed is in a state of "overdraft" (that is, more water is used than is naturally replenished), the Manual defines a project as "significant" if its net consumption exceeds 31 acre-feet per year (afy). The Report calculates the Diamond Rock mine's net consumption to be 28.12 afy, and accordingly classifies its impact as not significant.

The Diamond Rock mine could also affect the already "relatively poor" quality of the water in the Cuyama River basin if excavation exposes groundwater. Exposed groundwater could evaporate and leave more concentrated solids in the aquifer. To assess the risk of such exposure, the Report looks at historical data for nearby wells to see how far below ground water was typically found. The depth of standing water in the wells varied from year to year and from season to season, but was usually between 40 and 110 feet below ground surface (bgs). The Report opines that the ground beneath the mine site is "expected to be saturated." The Report states also that "[u]nder most conditions, groundwater would be located below the proposed maximum mining depth [of 90 feet]."

The Report classifies the mine's impact on water quality as "adverse, but not significant" (boldface omitted) for three reasons: (1) the "very low" frequency with which groundwater would be exposed; (2) the "very short" duration for which it would be exposed before percolating back into the ground; and (3) the "very small" surface area of the exposed groundwater "compared to the groundwater stored in the basin." The County nevertheless imposed a protective measure, condition 64 of the conditional use permit. This measure prohibits excavation "to the level of groundwater"; requires excavation to remain "at least an average of six feet above water level"; and obligates Troesh to backfill any pit to a depth of six feet should any groundwater be exposed.

C. *Judicial Review of Report*

Save Cuyama petitioned the trial court for a writ of mandate to compel the County to correct deficiencies with the Report. The court denied the writ, and this appeal followed.

*DISCUSSION*

Our review is limited to ascertaining whether the County abused its discretion in approving the Report. (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1375 [43 Cal.Rptr.2d 170] (*Gentry*).) An agency abuses its discretion if (1) it has not followed CEQA's procedures for preparing an environmental impact report or (2) the report's findings are not supported by "substantial evidence"—that is, not supported by "enough relevant information and reasonable inferences from [that] information that a fair argument

can be made to support [the Report's conclusions]." (Cal. Code Regs., tit. 14, § 15384.)[3] We independently review the agency's compliance with CEQA's procedures (*Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 944 [77 Cal.Rptr.3d 239, 183 P.3d 1210]), but accord considerable deference to the report's determinations—presuming them correct and resolving all reasonable doubts in their favor. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 [104 Cal.Rptr.2d 326]; *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1019 [280 Cal.Rptr. 478] (*Sacramento Old City Assn.*).) Because the goal of an environmental impact report is to provide information to decision makers and the public (*Fairview Neighbors v. County of Ventura* (1999) 70 Cal.App.4th 238, 242 [82 Cal.Rptr.2d 436]), we are not concerned with the ultimate *correctness* of the report's conclusions (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 372 [54 Cal.Rptr.3d 485]). Save Cuyama bears the burden of proving the Report's inadequacy. (*Save Our Peninsula, supra,* at p. 117.)[4]

## A. *Hydrological Impacts*

Save Cuyama raises three challenges to the Report's analysis of the Diamond Rock mine's hydrological impacts on the Cuyama River: (1) the County violated CEQA in defining its threshold of significance for assessing the impacts; (2) substantial evidence does not support the Report's finding that the mine's hydrological impacts are minor; and (3) MM W-2 is too nebulous to satisfy CEQA.

### 1. *Threshold of significance*

Save Cuyama asserts that the County's decision to use, as a threshold of significance, its own four-part definition of "adverse hydraulic impacts" violates CEQA for three reasons: (1) the County may not deviate from the threshold of significance in Appendix G unless it formally adopts a different threshold; (2) even if no formal adoption is required, the Report's citation of two thresholds makes it unclear which one the Report used; and (3) the County did not in any event explain why it was not using Appendix G's threshold.

---

[3] Further references to the Code of Regulations are referred to as "CEQA Guidelines."

[4] Because we review the agency's action without regard to the trial court's rulings (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [53 Cal.Rptr.3d 821, 150 P.3d 709]), we do not discuss that court's decision.

■ Save Cuyama's first argument lacks merit. Although an agency must determine whether "any of the *possible* significant environmental impacts of [a] project will, in fact, be significant" (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109 [11 Cal.Rptr.3d 104]), CEQA grants agencies discretion to develop their own thresholds of significance (CEQA Guidelines, § 15064, subd. (d)). More to the point, CEQA only requires that a threshold be formally adopted if it is for "general use"—that is, for use in evaluating significance in all future projects. (See *id.,* subd. (b).) Because the County's threshold in this case was specific to this Report (and hence not for "general use"), Save Cuyama is incorrect in asserting that formal adoption was required. (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 896 [124 Cal.Rptr.3d 755].)

■ We also reject Save Cuyama's argument that it was unclear what threshold the Report applied. As noted above, the Report cites Appendix G's factors as those that "could trigger a finding of potentially significant impact." But when the Report turns to the hydrological impacts of the Diamond Rock mine, it defines and applies its own "adverse hydraulic impacts" threshold. This is not ambiguous. Nor is the Report misleading when it refers to its project-specific threshold as being "under CEQA." CEQA permits an agency to define its own project-specific thresholds, so any threshold so adopted is "under CEQA." (See CEQA Guidelines, § 15064, subd. (d).)

Further, the County was not required to explain why it did not use Appendix G's thresholds of significance. Those thresholds are "only" a "suggest[ion]." (CEQA Guidelines, § 15063, subd. (f).) To require any deviation from them to be documented and justified, as Save Cuyama suggests, is to elevate Appendix G from a suggested threshold to the presumptive threshold. This flatly contradicts both CEQA's description of Appendix G as only suggested and CEQA's mandate that agencies have the power to devise their own thresholds. (CEQA Guidelines, § 15063, subd. (f).)

2. *Substantial evidence to support impact analysis*

Save Cuyama challenges three different findings the County makes in its analysis of the Diamond Rock mine's hydrological impacts as unsupported by substantial evidence. Each challenge fails.

First, Save Cuyama argues that the Report does not support its finding that any hydrological impact of the Diamond Rock mine on the Cuyama River will be of "minor" "magnitude." In Save Cuyama's view, the combined

extraction load of the Diamond Rock and GPS mines will create a sediment deficit of 771,000 tons each year, and the impact of such a deficit is necessarily significant. This impact, moreover, cannot be minimized or explained away by reference to anecdotal evidence regarding the hydrological impact of the lower yield GPS mine alone. Relatedly, the Report is wrong in finding that any hydrological damage will be temporary due to periodic heavy floods that will repair any damage. These deficiencies in the Report, Save Cuyama asserts, were noted by the United States Environmental Protection Agency (EPA) and Save Cuyama's own experts.

The Report's assessment of the Diamond Rock mine's hydrological impacts is supported by substantial evidence. To begin with, the Report explains why the sediment deficiency does not inevitably translate into adverse hydrological impacts. In particular, the Report explains that the mine would for the most part extract material from the river's *bed*, not the river's *flows* (or, more to the point, from the sediment those flows carry). Although, as the Report acknowledges, the Diamond Rock mine will sometimes capture some of the annual 229,000 tons of surplus sediment naturally deposited in that portion of the riverbed when the mine's berms are overrun, the Report explains in detail why downstream channel degradation and headcutting are nonetheless unlikely to occur or to have any "adverse hydraulic impact."

The Report also adequately explains why the cumulative prior impact of the smaller GPS mine is relevant in assessing the combined future impact of the GPS and Diamond Rock mines. The absence of any headcutting or downstream channel degradation with the GPS mine sheds light on the vulnerability of the riverbed in this area to those impacts. This vulnerability turns on considerations such as the composition of the rock, and not on the volume of the sediment extracted.

Furthermore, the Report sufficiently explains why the riverbed would be replenished by the surplus sediment that would be deposited by flows passing over previously scoured areas once any upstream pits in the path of the river were filled. The substantiality of evidence is not, as Save Cuyama suggests, undermined by the differing expert opinions of the EPA and Save Cuyama's experts. (CEQA Guidelines, § 15151 ["[d]isagreement among experts does not make an [environmental impact report] inadequate . . ."]; *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 626 [91 Cal.Rptr.3d 571].)

Second, Save Cuyama contends that the Report's findings are deficient because they did not consider two photographs Save Cuyama proffered, as part of a PowerPoint presentation, that allegedly show headcutting. The County noted, however, that the photos were meaningless unless shown to be

photographs accurately depicting the relevant portion of the river. Nor did the County err in failing to investigate those photos on its own. Until properly identified, followup would have been exceedingly difficult, if not impossible.

Third, Save Cuyama argues that the Report is internally inconsistent because it finds the hydrological impacts to be minor, but nonetheless declares them to be significant but mitigable. Worse yet, the Report makes no effort to quantify them. We see no inconsistency. The Report frankly acknowledges no present or likely impacts of any significant magnitude, but out of an abundance of caution and due to the uncertainties of predicting and quantifying these impacts, elects to treat the impacts as *more* significant than they currently appear to be.

### 3. *Sufficiency of MM W-2*

Save Cuyama levels three attacks on MM W-2. As an initial matter, Save Cuyama contends that MM W-2 is defective because its "trigger" for requiring corrective action—"adverse hydraulic conditions"—is undefined or, at best, inconsistently defined.

■ CEQA usually requires mitigation measures to be defined in advance. (CEQA Guidelines, § 15126.4, subd. (a)(1)(B); *Sacramento Old City Assn., supra,* 229 Cal.App.3d at p. 1027.) But deferral is permitted if, in addition to demonstrating some need for deferral, the agency (1) commits itself to mitigation and (2) spells out, in its environmental impact report, the possible mitigation options that meet "specific performance criteria" contained in the report. (*Sacramento Old City Assn., supra,* at pp. 1027–1029; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 793 [32 Cal.Rptr.3d 177]; see Pub. Resources Code, § 21100, subd. (b)(3).)

■ The County has demonstrated its commitment to mitigation by conditioning the issuance of Troesh's conditional use permit on compliance with MM W-2. MM W-2's trigger is also legally sufficient for two intertwined reasons. First, MM W-2's reference to "adverse hydraulic conditions" with "off-site impacts" tracks the language of "adverse" "hydraulic impacts" contained in the Report and thereby incorporates that definition. Second, MM W-2 requires compliance with SMARA, which is administered by the OMR. " '[A] condition requiring compliance with environmental regulations is a common and reasonable mitigating measure.' [Citation.]" (*Gentry, supra,* 36 Cal.App.4th at p. 1394; see *Defend the Bay v. City of Irvine* (2004) 119

Cal.App.4th 1261, 1276 [15 Cal.Rptr.3d 176].) Furthermore, these two definitions dovetail neatly, for the Report's definition of "adverse" "hydraulic impacts" closely tracks the regulatory standard of SMARA set forth in CEQA Guidelines section 3710, subdivision (c).

We reject Save Cuyama's related argument that reliance on the Report's definition of "adverse hydraulic impacts" is inconsistent with MM W-2's requirement that Troesh be vigilant for "evidence of headcutting or channel degradation." MM W-2's citation to these two conditions, by its plain terms, sets forth what is to be monitored—not when action is required. Indeed, the only wrinkle we find is that MM W-2 is triggered not only when "adverse hydraulic conditions" are "evident," but also when those conditions "appear to be developing." However, we have found no authority precluding an agency from requiring mitigation prior to a fixed and clear trigger condition when doing so is *more* protective of the environment.

Save Cuyama next asserts that MM W-2 does not spell out the criteria by which its effectiveness will be evaluated. A deferred mitigation measure should set forth "specific and mandatory performance standards to ensure that the measure[], as implemented, will be effective." (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 94 [108 Cal.Rptr.3d 478].) MM W-2 requires Troesh to "avoid these impacts." This necessarily refers to the "adverse hydraulic conditions . . . which could result in off-site impacts" that, as noted above, are sufficiently definite.

Save Cuyama lastly contends that MM W-2's remedial alternatives— "modifying the mining pit lay-out, width and/or depth"—do not go far enough because they do not include reduction of the annual extraction load. Substantial evidence therefore does not support a finding the MM W-2 will be effective, as required by *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1116–1119 [85 Cal.Rptr.3d 50]. The impacts to be mitigated here, however, are channel degradation and headcutting having the offsite impacts as defined in the Report and in CEQA Guidelines section 3710, subdivision (c). Because these impacts are caused by how water flows into and out of the mining pits, measures to reconfigure the orientation of those pits (that is, their layout, width and depth) address those impacts.

B. *Water Impacts*

1. *Water usage*

Save Cuyama argues that the Report's analysis of the Diamond Rock mine's effect on the water supply of the Cuyama Valley is deficient because

(1) the Report uses the same threshold of significance—31 afy—to assess the project's individual and cumulative impacts, and (2) the 31-afy standard is out of date.

 Under CEQA, a project having no significant effect on the environment when considered by itself may nonetheless have such an impact when considered in conjunction with—or cumulatively to—other past, existing or planned environmental influences. (CEQA Guidelines, §§ 15130, subd. (a), 15064, subd. (h)(1).) This is why the "[a]ssessment of a project's cumulative impact on the environment is a critical aspect of the [environmental impact report]." (*Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1025 [68 Cal.Rptr.2d 367].) Because, in most cases, the threshold for assessing the significance of the impact of a project on its own will be higher than the threshold for assessing its cumulative impact, Save Cuyama reasons that the Report's threshold must be invalid for using the *same* 31-afy measure to assess individual *and* cumulative impact.

We disagree. The County's 31-afy threshold of significance assesses *cumulative* impact. It was derived from an examination of the tolerable impact of an individual project on the amount of water available *basinwide*. Thus, the County amply considered the cumulative impact of the Diamond Rock mine on the water supply of the Cuyama River basin. What the Report lacks is an independent examination of the mine's noncumulative impact on water usage. Such an examination is unnecessary, however, because the Report already finds the mine has no significant impact under what is an undoubtedly more stringent cumulative-impact threshold.

Nor does the Report suffer from the analytical flaws found in *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692 [270 Cal.Rptr. 650], *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98 [126 Cal.Rptr.2d 441], or *Los Angeles Unified School Dist. v. City of Los Angeles, supra,* 58 Cal.App.4th 1019. The agencies in these cases erred by labeling a project's impact as insignificant merely because that impact was a "drop in the bucket" to an already existing environmental problem.

The Report's finding that the 1992 threshold remains relevant is supported by substantial evidence. Although there had been some additional agricultural water usage in the basin since 1992, the County consulted with its water agency and examined more recent studies and, on that basis, found that the 1992-defined threshold was still valid. Save Cuyama's disagreement does not undermine this substantial evidence.

2. *Water quality*

Save Cuyama challenges the Report's finding that Diamond Rock mine will not have a significant impact on water quality and that condition 64 is a feasible means of mitigating adverse impacts.

There was no deficiency with condition 64's requirement that Troesh fill in any water it encounters and at all times keep the bottom of its mine pits at least six feet above any water. This mitigation measure is a requirement of Troesh's conditional use permit, sets forth a specific standard, and would be effective in halting exposure of water except in times of seasonal floods (when the pits will be flooded anyway).

However, we agree with Save Cuyama that the Report's conclusion that the Diamond Rock mine's impact on water quality is "not significant" (boldface omitted) is not supported by substantial evidence. This conclusion appears to rest on the Report's observation that "[u]nder most conditions, groundwater would be located below the proposed maximum mining depth" of 90 feet. This statement ostensibly forms the basis for the Report's finding that the groundwater would be exposed infrequently and briefly, and hence for the Report's conclusion that the mine's impact on water quality will not be significant. Yet this statement is in tension with the data showing that the groundwater in nearby wells is found anywhere between 40 and 110 feet below ground, as well as with other statements in the Report itself recounting the underlying well data.

 Save Cuyama must still establish that the Report's unsupported conclusion regarding the severity of the environmental impact is prejudicial. (Pub. Resources Code, § 21005, subd. (a); *Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council* (2010) 190 Cal.App.4th 1351, 1385 [119 Cal.Rptr.3d 481] (*Sunnyvale*).) An error is prejudicial when an agency fails to comply with a mandatory CEQA procedure or when a report omits information and thereby precludes informed decisionmaking. (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1182 [31 Cal.Rptr.3d 901] (*Lighthouse*); *Schoen v. Department of Forestry & Fire Protection* (1997) 58 Cal.App.4th 556, 565 [68 Cal.Rptr.2d 343].) We cannot overlook a prejudicial error by surmising that the project would have gone forward anyway. (*Sunnyvale, supra*, at p. 1388.)

But no prejudicial error occurred here. Instead, what we have is a Report that sets forth all the pertinent data and follows all the procedures, but comes to the wrong conclusion in classifying the severity of an environmental impact.

Save Cuyama has not shown how this error matters. Notwithstanding the Report's erroneous conclusion that the impact was not significant, the County still insisted that Troesh implement condition 64. Critically, this condition obligates Troesh to ensure that no groundwater is exposed—at *whatever depth* it is encountered. Although Save Cuyama contests the condition's efficacy, it does not dispute that the condition—if feasible—would be wholly effective in negating the mine's adverse impact on water quality. Consequently, on these facts, the Report's unsupported conclusion regarding significance is of no moment.

In these respects, this case is similar to *Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180 [24 Cal.Rptr.3d 543]. There, the court found no prejudice arising from the city's erroneous conclusion that mitigation of a significant impact was not feasible. The court so held after determining that report's mistaken conclusion had no effect on the report's informational content or its recommendations. (*Id.* at pp. 1206–1207.) The same is true here.

■ *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645 [57 Cal.Rptr.3d 663], cited by Save Cuyama, is not to the contrary. In that case, the environmental impact report incorrectly described the underlying project as *both* increasing mining operations and not increasing them. This sent "conflicting signals to decision makers." (*Id.* at pp. 655–656.) Put differently, the report's internal inconsistency " 'precluded informed decisionmaking' " and was, for that reason, prejudicial. (*Lighthouse, supra*, 131 Cal.App.4th at p. 1182.) However, not all inconsistencies are prejudicial: "It is not enough . . . that [an environmental impact report] misstate[s] an aspect of a proposed project." (*Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 226 [148 Cal.Rptr.3d 195].)

■ The inconsistency here was not prejudicial. Unlike the report in *San Joaquin Raptor Rescue Center*, the Report here did not inconsistently describe the Diamond Rock mine. Instead, the Report offered a summary of the well data (or perhaps an opinion to be drawn from that data) that was arguably inconsistent with the data itself—at least if one looks solely at the data and ignores the annual and seasonal variations in water levels. At most, this inconsistency spawned the erroneous conclusion regarding the significance of the mine's environmental impact. However, as we have explained, any error in that conclusion was not prejudicial.

## DISPOSITION

We affirm the judgment denying the petition for a writ of mandate. The parties shall bear their own costs on appeal.

Yegan, Acting P. J., and Perren, J., concurred.

On February 8, 2013, the opinion was modified to read as printed above.